**In the Matter of COLONIAL DISTRIB-
UTING COMPANY, Bankrupt.**

**No. 67–28.**

United States District Court
D. South Carolina.

Dec. 3, 1968.

See also D.C., 291 F.Supp. 154.

Roy D. Bates, of Marchant, Bristow & Bates, Columbia, S. C., for trustee.

E. N. Brandon, Asst. Atty. Gen. of South Carolina, Columbia, S. C., for William L. Harrelson, Commissioner of Agriculture.

HEMPHILL, District Judge.

Review of the Special Master in Bankruptcy's findings supporting the trustee's objection to the claim of South Carolina Department of Agriculture is sought in this forum.[1] The claim [2] was initially made by Commercial Bank and Trust Company along with Carolina Na-

---

1. Hereinafter the claim will be delineated as that of the State and all positions taken will be those of the State.

2. The State, through the Commissioner of Agriculture, claims that it has a su-

perior right to certain liquors or their value due to possession of these liquors prior to the date of bankruptcy. The claim revolves around the validity of South Carolina warehouse receipts.

tional Bank of Columbia. The State of South Carolina has paid these claims and has taken an assignment of any rights the bank might have had under the warehouse receipts.

Prior to bankruptcy, on September 17, 1959, the Bankrupt leased its warehouse property to the South Carolina Department of Agriculture. This is the property on which the Bankrupt stored and distributed its liquors. A recorded real property lease remained in effect until February 1967 at which time the State took possession of the warehouse and liquors therein. Dorothy B. Bass served as warehouse manager by appointment of the State Agriculture Department but received her salary from the Bankrupt. Loans on the stock of the Bankrupt were made by the two banks who in turn took warehouse receipts and demand promissory notes.

A hearing was held on September 8, 1967, to determine the validity of the claim of the banks and the objections of the trustee.

The trustee's objection [3] to the claim was based on the alleged lack of valid warehouse receipts pledged to the banks. His position is that there was no exclusive possession by the warehouse manager sufficient to constitute a definite sequestration. He further asserts that the goods were commingled in the warehouse indiscriminately without regard to the warehouse receipts; and takes the position that the statutory requirements of the Uniform Warehouse Receipts Act (S.C.Code 69–162) were not met in that the receipts did not show whether the

goods would be delivered to bearer or to a specified person or his order nor did there appear on the receipt a rate of charge. The trustee insists that subsequent possession by the State would not cure the invalidity of the warehouse receipts because the goods were not fungible.[4]

The State, by its brief of February 2, 1968, positions that the receipts were negotiable, representing the goods themselves, thereby avoiding any need to segregate the goods under warehouse receipts; accordingly, it was not necessary to have possession. Further positions taken by the State were that the language of the receipts satisfied the statutory requirement of § 69–162(4) [5]; that failure to state the rate charged was not fatal to validity; and that goods under warehouse receipts were fungible by custom and by commodity, and as such, could properly be commingled.[6] This would buttress the State's position that subsequent possession by locking up the warehouse would give it a secured interest in the liquor equivalent to the value of the warehouse receipts. A final position taken by the State is that its lease was recorded giving constructive notice and from this any interested party could come to the Department of Agriculture and determine that the goods were under warehouse receipts.

The Special Master in Bankruptcy rendered his findings on April 8, 1968. He found that there was no recording of the security interest of the State as required by S.C.Code Ann. (1962) Section 60–101 and Section 57–308, incum-

---

3. This is evidenced by his brief of September 21, 1967.

4. In common parlance: interchangeable. According to Section 69–152(3) S.C.Code 1962 Anno.: *Fungible goods* means goods of which any unit is, from its nature or by mercantile custom, treated as the equivalent of any other unit.

5. Section 69–162(4) S.C.Code Anno. (1962) provides: A statement of whether the goods received will be delivered to the bearer, to a specified person or to a specified person or his order.

6. Section 69–196, S.C.Code Anno. (1962) provides: Fungible goods may be mingled.—If authorized by agreement or by custom a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole.

bent on the State to validate its claim through the use of field warehousing.[7] From this he determined, under the field warehousing law, that the State had not maintained such exclusive possession of the goods under receipt as would breathe life into an otherwise invalid field warehouse (receipt) financing arrangement. The only elements indicating possession on the part of claimant were "No Smoking" signs over the name of the South Carolina Department of Agriculture, the existence of the recorded lease, and the appointment of a warehouse manager who signed the receipts issued against the goods. He found, with these exceptions, that possession and control was exclusively in the hands of the Bankrupt with the exception of certain periodical checks by the State.

The Special Master did not make a specific finding of fact relative to the issue of insolvency at the time when the transfer is claimed to have taken place by possession. He did find, however, that the State took possession of the warehouse in February, 1967, after an inventory revealed a shortage of goods under receipts. Not crucial to the issues before this reviewing authority is the conclusion that there was reasonable cause to believe that the Bankrupt was insolvent at this time. See General Electric Credit Corporation v. Davis, 224 F. 2d 322 (4th Cir. 1955). The record further supports the finding that the Bankrupt was in fact insolvent in February, 1967.

The Special Master further found that the receipts carried absolute title to the goods described but that a prerequisite to this was a need for valid negotiable warehouse receipts, and since there were no such receipts, due, among other things, to the lack of possession[8] and control of the goods under the receipts, that this would go only to establish the good faith of the lending party. He also found that the State enjoyed no more protection due to its sovereignty than would any other operator of a warehouse system. Therefore the same requirements of validity would apply to the State as would apply to any other warehouse system.

The State filed its objections to the Report of the Special Master which detailed the position the State had taken prior to the Special Master's Report. An August 18, 1968, hearing was held in this court and supplemental brief of the State seeks to buttress its position in that it had possession of all goods prior to the effective date of bankruptcy, which it alleges is March 2, 1967, and therefore had a possessory interest in the goods. In support of this, South Carolina asserts that the goods are fungible and as

---

7. The Referee made special note of the history of "field warehousing" which he defined as follows:

  Since there was no recording of claimant's security interest, its validity against the trustee can only be sustained under the pledge theory. A pledge, valid against attack by creditors, may be established by constructive possession in the pledgee where goods are in the possession of a third party bailee. This occurs when goods are stored in a warehouse and warehouse receipts representing the goods are delivered to the pledgee.

  From this fractual pattern and the theory of constructive possession of the goods in the holder of warehouse receipts there developed a financing device known as 'field warehousing.' Where it becomes impractical to deliver goods to a warehouse, the warehouse

comes to the debtor in the sense that the debtor's premises are leased to a warehouseman in which goods are stored and warehouse receipts covering the goods are issued and delivered to a financer by way of pledge. See Skelton, Field Warehousing as a Financing Device, 1961, Wis.L.Rev. 221.

8. It appears that the finding by the Special Master that the goods were not marked or segregated so as to identify them with the marks and descriptions, on the warehouse receipts emphasizes to the Bankruptcy Court that lack of control or supervision necessary to show possession under the warehouse receipts. The District Court, as hereinafter indicated, specified that segregation by brands is a feasible and reasonable expectation under circumstances similar to those existing here.

such there was no necessity to segregate them. The trustee, in reply, relying on the case of Whitney National Bank of New Orleans v. Sandoz, 362 F.2d 605 (5th Cir. 1966) counters that this case stands for the proposition that if the original warehouse receipt was sham or spurious then the defect cannot be cured by subsequent possession and the trustee can maintain his rights as a hypothetical lien creditor under Section 70, sub. c of the Bankruptcy Act.

■ The universal rule is that the findings of the Referee should be adopted unless clearly erroneous or are not supported by substantial evidence. Joy Manufacturing Company v. Brooks, 224 F.Supp. 537 (S.D.W.Va.1963) aff'd 325 F.2d 721 (4th Cir. 1963). Collier on Bankruptcy § 39.28, Vol. 2, pp. 1514–1528.

The findings of the Special Master, based on the record, in thumbnail form are as follows: that the Bankrupt leased its property to the State on September 17, 1959, that this was the property where Bankrupt received, stored, and distributed its liquors; Dorothy B. Bass served as warehouse manager by appointment of the Commissioner of Agriculture but received her salary and instructions from the Bankrupt; that warehouse receipts were issued on liquors purchased by employees of Bankrupt indicating on the warehouse receipts brand, size, number of cases and value; that these receipts were signed by the warehouse manager without accuracy and without control over the sale or distribution of liquors from the warehouse; that nothing was done to identify the goods under warehouse receipts; that inventory taken by the State was without regard to the specific brands or sizes called for in the receipts; that officers and employees had possession of the keys and had complete control of the goods under receipt and some of the goods were sold to retailers without notations on the receipt, and that the only notice which would indicate that the warehouse was under lease was a sign "No Smoking, South Carolina Department of Agriculture."

From these facts the Special Master disallowed the claim of the State. The State now urges that this court find error with the findings of the Special Master and their application to the law of the case. As the Special Master stated in his opinion, two basic methods exist by which one can perfect a security interest. The usual method is by following the recording statutes of this State.[9] The second method is the pledge device.

9. S.C.Code Ann. (1962) §§ 60–101 and 57–308 are as follows:

§ 60–101. Conveyances, etc., valid as to purchasers, etc., only when recorded.— All deeds of conveyance of lands, tenements or hereditaments, either in fee simple or for life, all deeds of trust or instruments in writing conveying either real or personal estate, creating a trust in regard to such property or charging or encumbering it, all mortgages or instruments in writing in the nature of a mortgage of any property, real or personal, all marriage settlements or instruments in the nature of a settlement of a marriage, all leases or contracts in writing made between landlord and tenant for a longer period than twelve months, all statutory liens on buildings and lands for materials or labor furnished on them, all statutory liens on ships and vessels, all certificates of renunciation of dower, all contracts for the purchase and sale of real property, all assignments, satisfactions, releases and contracts in the nature of subordinations, waivers and extensions and landlords' liens, laborers' liens, sharecroppers' liens or other liens on real or personal property, or both, created by law or by agreement of the parties and generally all instruments in writing required by law to be recorded in the office of the register of mesne conveyances or clerk of court in those counties where the office of the register of mesne conveyances has been abolished or in the office of the Secretary of State delivered or executed on or after August 1, 1934, except assignments and satisfactions of conditional sale contracts securing the purchase money of motor vehicles or refrigerators or security interest in vehicles of types for which certificates of title are required under chapter 3 of Title 46, shall be valid so as to effect the rights of subsequent creditors (whether lien creditors or simple contract creditors) or purchasers for valu-

This theory of, or method of perfecting a security interest against competing claims of lien creditors is that possession of the collateral is passed to the pledgee. This prevents creditors from being misled. The pledge device is not required to be recorded in South Carolina.[10]

The use of field warehouse receipts as a form of financing developed from the pledge theory. Field warehousing is used when it is impractical to move the goods; instead the goods remain on the premises of the manufacturer or merchant (in this case a wholesaler). To make this arrangement effective the goods must be delivered to a warehouseman who is given exclusive possession of the goods. The warehouseman then issues warehouse receipts which evidence the pledge and serve to secure loans made by third persons on faith of the receipts and who look to the deposited goods as/for security. It is simply a matter of having the warehouseman come to the borrower rather than the goods going to the warehouseman. Whitney National Bank of New Orleans v. Sandoz, 362 F.2d 605 (5th Cir. 1966) citing Lawrence Warehouse Company v. McKee, 301 F.2d 4 (5th Cir. 1962); Whitney, Law of Modern Commercial Practices, 938, § 664; Financing Through Field Warehousing, 69 Yale L.J. 663.

■ The State asserts that the recording of its real property lease on the building gave constructive notice that the field warehouse receipts were in existence; further, that copies of the warehouse receipts were on file at the Department of Agriculture where they could be inspected by prospective creditors. This does not satisfy the recording acts of South Carolina.[11] Therefore, for the State to enjoy the status of a secured lien creditor it must have been

able consideration without notice only from the day and hour when they are recorded in the office of the register of mesne conveyances or clerk of court of the county in which the property affected is situated, in the case of real estate or in the case of personal property, in which the owner of such property resides, if he resides within the State, or, if he resides without the State the county in which such personal property is situated at the time of the delivery or execution of such deed or instrument. But in case of a subsequent purchaser of real estate, or in the case of a subsequent lien creditor on real estate or personal property or both, for valuable consideration without notice, the instrument evidencing such subsequent conveyance or subsequent lien must be filed for record in order for its holder to claim under this section as a subsequent creditor or purchaser for value without notice, and the priority shall be determined by the time of filing for record.

But chattel mortgages or instruments in the nature thereof, securing the payment of the purchase price or any portion thereof of household furniture and furnishings, appliances, refrigerators, radios, and musical instruments, shall be valid against the lien of a landlord for rent when so recorded within five days from the date of the execution thereof.

§ 57–308. Parol and unrecorded reservations in personal property by vendors and bailors.—Every agreement between the vendor and vendee or the bailor and bailee of personal property whereby the vendor or bailor shall reserve to himself any interest in the property shall be null and void as to subsequent creditors (whether lien creditors or simple contract creditors) or purchasers for a valuable consideration without notice unless such agreement be reduced to writing and recorded in the manner provided by law for the recording of mortgages. In the case of a subsequent mortgagee of the property for valuable consideration without notice, the instrument evidencing such subsequent mortgage must be filed for record in order for its holder to claim under this section as a subsequent mortgagee for value without notice and the priority shall be determined by the time of filing for record. But nothing herein contained shall apply to livery stable keepers, innkeepers or other persons letting or hiring property for temporary use or for agricultural purposes or depositing such property for the purpose of repairs or work or labor done thereon or as a pledge or collateral to a loan.

10. See S.C.Code Ann. 57–308, supra; Tucker v. Hudgens, 132 S.C. 374, 129 S.E. 77 (1925).

11. See S.C.Code Ann. (1962) §§ 60–101 and 57–308, supra.

operating under valid field warehouse receipts.

As the court said in Whitney National Bank of New Orleans v. Sandoz, 362 F.2d 605 (5th Cir. 1966):

For warehouse receipts issued by a field warehouseman to have validity they must be issued by a bona fide, independent warehouseman.[12] The borrower cannot be his own warehouseman and receipts issued by one who is a warehouseman in name only can have no validity. The portion of the borrower's property set aside as a warehouse must be under the exclusive control of the warehouseman. The warehoused goods must be in the exclusive possession of the warehouseman, with the borrower excluded as well as others. There must be adequate markings of the warehouse area and of the warehoused goods. The goods must be so stored and so described in the warehouse receipts that there can be an identification of specific goods to match particular descriptions. Goods are to be released only upon the production and surrender of the receipts covering the goods withdrawn. Security Warehousing Co. v. Hand, 206 U.S. 415, 27 S.C. 720, 51 L.Ed. 1117, 11 Ann.Cas. 789; Lawrence Warehouse Company v. McKee, supra; Pittman v. Union Planters National Bank & Trust Co., 6th Cir. 1941, 118 F.2d 211, cert. den. 314 U.S. 632, 62 S.Ct. 65, 86 L.Ed. 507; In re Spanish-American Cork Products Co., 4th Cir. 1924, 2 F.2d 203, cert. den. Western Nat. Bank of Baltimore v. Chapman, 266 U.S. 634, 45 S.Ct. 225, 69 L.Ed. 479; Whitney,

Law of Modern Commercial Practices, 940 et seq., §§ 666–668.

Applying the test of *Whitney*, supra, to the critical question *Was there the appearance of exclusive possession and actual substantial control and possession in the warehouseman?* there can be no doubt that facts support the findings of the Special Master. The only factors in favor of the State are the lease which would not indicate that warehouse receipts were in actual existence, a "No Smoking" sign, and a formal warehouse manager paid by the Bankrupt. It cannot be accurately stated that one who came into the warehouse could see that some of the goods were financed under field warehouse receipts and if so how much. There was no segregating by brand, volume or otherwise. The control of traffic was completely in the hands of the Bankrupt.

There should have been signs put up to put anyone on notice that field warehousing was being practiced; the goods should have been segregated in accordance to volume, brand [13] and in accordance with the trust receipts so that they would directly correspond to what was called for on the trust receipts. Further, these liquors should have been partitioned by way of wall or fence from the other liquors in the warehouse under lock and key with an independent warehouseman having exclusive possession of both the goods and the key except for any emergency measures. This would not be unduly burdensome and would be effective. This standard is not too high when the monetary risk involved is taken into consideration. Anyone using this financial arrangement should have no objections.

12. The State is allowed to accept alcoholic beverages for storage pursuant to S.C. Code § 4–9; leasing is allowed under S.C.Code Ann. 69–102; and appointment of bonded warehouse managers is allowed under S.C.Code Ann. 69–103.

13. The warehouse receipts call for the liquor by brand name. To anyone in the trade, and this would encompass creditors whose rights are at stake as well as others doing business with a wholesale

liquor house, there is an acknowledged and marked difference between such delights as scotch, bourbon, gin, rum, vodka and the like. Perhaps the Temperance League would consider all whiskey the same (and all evil), but the court cannot envision the Temperance League handling warehouse receipts for whiskey. Also obvious is the difference in price between the various kinds and brands. See footnote 8, supra.

The State would urge that since it has negotiable warehouse receipts, that these receipts carry absolute title to the goods described and are representative of the goods.[14] Flint Frozen Foods v. Firemen's Insurance Co. of Newark, 12 N.J. Super. 396, 79 A.2d 739. Therefore, these receipts are symbolic of delivery of the property. Ex Parte Harris and Co., 141 S.C. 430, 140 S.E. 101.

This position, however, is not a tenable one unless the receipts themselves are valid in their inception. For if they are mere warehouse receipts in form only, a holder of such a receipt cannot be said to have a preferred position. The district court in In Re Pine Grove Canning Company, 226 F.Supp. 872 (W.D.La. 1963), met this issue head-on and affirmatively decided that lack of possession and control in the warehouseman coupled with other violations effectively destroyed the validity of the field warehousing arrangement. Therefore, a negotiable receipt for goods stored in such a manner is in effect no receipt at all and entitled to no more consideration than if it were forged or fictitious. This position was affirmed in Whitney National Bank of New Orleans v. Sandoz, supra, where the court stated that the requirements of the Uniform Warehouse Receipt Act were not met and the good faith of the lenders could not inject validity into documents which were warehouse receipts in form only.[15]

The trustee took the position that the receipts were invalid because of failure to follow the essential statutory elements of S.C.Code § 69–162(4) and (5). These sections require that the receipts contain a statement of whether the goods will be delivered to the bearer, to a specified person or his order and that the receipts contain a rate of charge. Having determined that the failure to sequestrate the goods under receipts and failure of the warehouseman to have complete and exclusive control of the goods was fatal to the validity of the receipts at the outset, the court feels it unnecessary to discuss any other issues of invalidity.[16] Furthermore, the court adopts the language found in the Report of the Special Master concerning the status of the State as a party.

Finally, claimant's position is in no way improved by the fact that an agency of the State of South Carolina attempted to act as the bailee-warehouse contrary to the usual pattern of a professional private field warehouseman. It is true that the South Carolina Department of Agriculture is authorized by statute to lease warehouse property and issue warehouse receipts on goods stored therein. S.C.Code of Laws, 1962, §§ 69–102, 69–110, 4–9. The South Carolina Uniform Warehouse Receipts Act, S.C.Code, 1962, § 69–151 se seq., limiting the authority to issue warehouse receipts to 'a person lawfully engaged in the business of storing goods for profit,' is expressly made 'cumulative to the laws governing the operation of the State warehouse system,' S.C.Code of Laws, 1962, § 69–156. While it is clear that the State has authority to engage in this type of warehousing and the issuance of receipts, it is equally clear that the legal requirements necessary to the validity of the receipts applies with the equal force to the present case

---

14. S.C.Code Ann. 69–227 and 69–228 (1962).

15. See also 93 C.J.S. Warehousemen and Safe Depositaries § 19; First Camden Nat. Bank & Trust Co. v. J. R. Watkins Co., 36 F.Supp. 416 (E.D.Penn.1941); Pittman v. Union Planters Nat. Bank and Trust Co., et al., 118 F.2d 211 (6th Cir. 1941).

16. This court does not pass on the negotiability of the warehouse receipts in this case. Such issue is not before the court. The court will take judicial notice of the custom and usage in South Carolina to issue warehouse receipts to "bearer." Most of the warehouse receipts are for cotton, concerning which the statute (S.C.Code 69–109, supra) requires bale identification by number, etc., limiting fungibility. As to wheat or feed grains, it is obvious they are to some degree fungible so that the commingling does not destroy validity.

where the State acts as the warehouseman.[17]

The final issue before the court is one of fungibility. This is defined in S.C.Code Ann. § 69–152, supra, as being goods of a unit or goods treated as such by nature or mercantible custom. The State's position on this issue is that even if the trust receipts were invalid, as long as there was no fraud or preference as to other creditors, that it (the State) could take possession of the liquors at any time up until the actual date of bankruptcy and this possession would protect them against general creditors and subsequent lien creditors. Fundamental to this position is the assertion that the liquors were fungible and one could take possession of the whole and from this could ultimately receive the value of his interest.

The Special Master did not make specific findings on the issue of fungibility but both the trustee and the State, by way of briefs, raise the issue and this seems to be the crutch the State ultimately seeks to lean on and the final vehicle which could save it from this unfortunate situation.

There can be no doubt that the taking of possession is a perfectly proper method of perfecting a security interest in chattels. Under section 70(c) of the Bankruptcy Act, 11 U.S.C.A. § 110(c) the critical date is the actual date of bankruptcy.[18] Lewis v. Manufacturers National Bank, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323. The trustee occupies the position of a creditor existing or hypothetical at the actual date of bankruptcy. *Lewis*, supra. This is to be distinguished from the rights of the trustee under 70 (e) which involves fraudulent transfer and Section 60, 11 U.S.C.A. § 96, which involves preferential transfers.

The State positioned, for the first time, before the District Court sitting in bankruptcy, that the act of the State in taking over the entire warehouse and contents, in February, 1967 fulfilled the possession requirement and then and there perfected the State's lien, or pledge. This argument is the antithesis of the ruling in *Sandoz*, supra, which this court follows.

■ The court does not have factual situation here where the goods are fungible and a preference is at issue under Section 60(a) (2) [19] of the Bankruptcy Act. The court finds, infra, that the goods are not fungible by definition of 69–152(3), supra, and as such can-

17. Pages 8 and 9, Report of the Special Master.
   This position is further sustained by *Whitney*, supra, where the court stated that "The issuance by a state commission of a warehouseman's license and a certificate of proper performance by the warehouseman will not supply the lack of essentials of validity in the field warehousing arrangement."

18. National Oates Company v. Long, 219 F.2d 373 (5th Cir. 1955), McKay v. Trusco Finance Co. of Montgomery, Alabama, 198 F.2d 431 (5th Cir. 1952).

19. 11 U.S.C.A. § 96(a) (1) and (2): Preferred creditors.
   (a) (1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

   (2) For the purposes of subdivisions (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee. A transfer of real property shall be deemed to have been made or suffered when it became so far perfected that no subsequent bona fide purchase from the debtor could create rights in such property superior to the rights of the transferee. If any transfer of real property is not so perfected against a bona fide purchase, or if any transfer of other property is not

not be commingled and require identification. Since the State was not a secured creditor under 70(c) (11 U.S.C.A. § 110(c)), it is unnecessary to discuss any preference 60, sub. a(2) (11 U.S.C.A. § 96(a) (2)).

Unfortunately, while possession could have been the salvation of the resources of the State, it will not work in the present case. It cannot be successfully argued that the liquors involved were fungible. The warehouse receipts themselves show that certain brands, volumes, and prices were financed, not simply by volume without regards to brand name or price. When these liquors were sold to retailers they were not sold merely as so many cases of liquor but were sold by brand name, quantity and price. It cannot be said that custom and usage was to trade in volume only nor can it be said that one case of liquor is the same as another. It has been held that various sizes of lumber are not fungible. Peoples Bank v. Aetna Indemn. Co., 91 Conn. 57, 98 A. 353; 133 A.L.R. 246,

nor are cans of corn, sweet potatoes and other vegetables which come in varying sizes. In Re Pine Grove Canning Co., supra. Surely it cannot be said that various brands, prices and volumes of liquor should be treated differently.

While commingling of fungible goods pursuant to section 69–196 of the South Carolina Act, supra, is allowed, when the goods are not fungible they are required to be identified.[20] Therefore, unless the party seizing possession can walk into the warehouse and say "those goods over there in that distinct area are mine because they correspond to the description on my trust receipt" he has no priority to a claim by making a general seizure. 133 A.L.R. 246; Peoples Bank v. Aetna Indemn. Co., 91 Conn. 57, 98 A. 353. In Re Pine Grove, supra.

The court cannot escape the conclusion that warehouse receipts were first envisioned to accommodate storage financing of agricultural commodities; thus the supervision of the State Department of Agriculture. This is not to say

so perfected against such liens by legal or equitable proceedings prior to the filing of a petition initiating a proceeding under this title, it shall be deemed to have been made immediately before the filing of the petition.

20. Identification required by the reading of S.C.Code Anno. 4–9, 69–106 and 69–109 which are as follows:

§ 4–9. Storage by Department of Agriculture without tax stamps.—The Department of Agriculture may accept for storage and warehousing any alcoholic liquors in the same manner as cotton or other agricultural products are stored and, in addition to all applicable laws relating to warehousing of cotton, the Department may make such rules and regulations, not inconsistent with this chapter nor with the statutes defining the duties of that office, providing that alcoholic liquors may be stored in such suitable warehouse or warehouses as may be determined by the Department without having affixed thereto the revenue tax stamps provided for under chapter 16 of Title 65. But when any alcohol liquor shall affix the revenue stamps provided for in such chapter before the removal thereof.

The Commissioner of Agriculture may pay from the fees collected by him for the storage and warehousing of intoxicating liquors the administrative costs incurred by him in the performance of his official duties as to such storing and warehousing and the balance remaining in his hands shall be paid to the State Treasurer.

§ 69–106. Storage of products other than cotton.—All the provisions of this chapter referring to cotton shall be understood likewise to refer to all nonperishable farm products as defined by the Commissioner of Agriculture, crates, cartons and canning supplies on storage.

§ 69–109. Receipts for cotton stored. —There shall be a receipt issued for lint cotton under the seal and signature of the Commissioner of Agriculture or his deputy thereunto duly authorized and in the name of the State, stating the location of the warehouse, the name of the manager, the tag number on the bale and the weight, grade and staple so as to be able to deliver on surrender of the receipt the identical cotton for which it was given. But the grade and staple may be omitted at the request of the depositor. Such receipt may be issued in bearer or order form.

that liquors are not properly subject, but the custom and usage referred to in the legislation bespeaks an understanding of the practices used in cotton and grain warehousing and financing. Those commodities are definitely fungible and the custom of interchange and substitution, as well as the lack of identity except by weight or volume is known and accepted. Intoxicating liquors, such as here, present no such custom or usage in this State and the lack of fungibility defies the prospect of future development. The Department of Agriculture cannot rely on custom or usage to salvage its waning fortunes here.

It is the conclusion of the court that the State enjoys no better position than a general creditor, has no secured interest and can proceed without prejudice as a general creditor. The findings and conclusions of the Special Referee are adopted and affirmed.[21]

And it is so ordered.

## APPENDIX A

## F I L E D

APR 9 - 1968

MILLER C. FOSTER, JR., CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF: <br><br> Colonial Distributing Company, <br><br> Bankrupt. | IN BANKRUPTCY NO. 67–28 <br><br> REPORT OF SPECIAL MASTER IN BANKRUPTCY <br> on Trustee's Objection to Claim of the South Carolina Department of Agriculture. |

———◆———

TO HONORABLE ROBERT W. HEMPHILL, UNITED STATES DISTRICT JUDGE:

I, the undersigned Special Master in Bankruptcy, report that on September 8, 1967, after due notice to all parties, a hearing was had before me, attended by the attorneys of record, on the merits of the trustee's objection to the secured claim of the South Carolina Department of Agriculture as successor in interest to The Commercial Bank and Trust Company, on the ground that said claim is invalid under Section 70(c) of the Bankruptcy Act, and the rights of the claimant are limited to those of an unsecured creditor.

## FINDINGS OF FACT

After careful consideration of the testimony presented, I find the following facts:

1. On September 17, 1959, Bankrupt leased its warehouse property at 816 Pulaski Street, Columbia, South Carolina, where Bankrupt received, stored and distributed liquors, to the South Carolina Department of Agriculture, said lease remaining continuously in effect until February, 1967.

21. For the purpose of reporting, the Special Master's Report is made Appendix A of this Order.

2. During the last few years of the term of said lease, Dorothy B. Bass served as warehouse manager by appointment from the South Carolina Department of Agriculture, receiving her entire salary and instructions from Bankrupt.

3. For several years prior to February, 1967, liquors purchased by Bankrupt coming into the warehouse were inventoried by Bankrupt's employees and warehouse receipts indicating brand, size, number of cases, and value and stating that they carried absolute title to the goods described were executed by Bankrupt's general manager and then signed by the warehouse manager without any knowledge of the accuracy of the receipts with respect to quantity or value stated thereon and without any control over the sale or distribution of the liquors from the warehouse thereafter.

4. No attempt was made to mark or segregate goods on which warehouse receipts were issued to distinguish them from other goods in the warehouse, and no identifying serial numbers appeared on the face of the warehouse receipts.

5. Warehouse receipts so executed were validated by the South Carolina Department of Agriculture without any inspection of the goods at the time of validation of the receipts to determine their validity.

6. Agents of the South Carolina Department of Agriculture made unscheduled inspections of the warehouse at periodic intervals of several weeks, taking an inventory by total case count of the goods in the warehouse against the total amount of goods under receipts without regard to the presence of specific brands and sizes called for by the receipts.

7. Some of the goods under warehouse receipts were sold to retailers without a release or any form of notation on the outstanding warehouse receipts, resulting in a shortage from time to time of specific brands called for in the receipts.

8. At all times during the term of the lease, several of Bankrupt's officers and employees had possession of keys and free access to the leased warehouse and complete control and possession of the goods under receipt therein.

9. The only outward indication that the warehouse was under lease was signs stating: "No Smoking, South Carolina Department of Agriculture Warehouse".

10. During 1966 and until January 17, 1967, The Commercial Bank and Trust Company and the South Carolina National Bank of Columbia, South Carolina, made a number of loans to Bankrupt taking demand promissory notes executed by Bankrupt and warehouse receipts executed as found above to secure such loans.

11. In taking warehouse receipts as security for loans, the banks relied on the values stated on the face of the receipts which at all times was in excess of the outstanding indebtedness.

12. Prior to February, 1967, payments were made to the bank by Bankrupt and new amounts loaned on the receipts leaving a claimed balance due as of the date of bankruptcy on April 21, 1967, of One Hundred Eighty Four Thousand Three Hundred Fifty Three and $^{59}/_{100}$ ($184,353.59) Dollars plus interest, and the total stated value on the face of the warehouse receipts held as security of Two Hundred Sixty-Six Thousand, Six Hundred Twenty-Nine and $^{50}/_{100}$ ($266,629.50) Dollars.

13. In February, 1967, the South Carolina Commissioner of Agriculture took possession of the warehouse after an inventory revealed a shortage of goods under receipts.

14. The State of South Carolina paid this claim to the banks receiving an assignment of any rights it may have under the warehouse receipts.

## QUESTION PRESENTED

Whether the banks and their successors in interest, the State of South Carolina, have a valid secured claim to goods

under warehouse receipts where such receipts issued under authority of the State Department of Agriculture were delivered to the banks in pledge as security for loans to Bankrupt?

## OPINION

The trustee in Bankruptcy attacks the validity of claimant's alleged secured claim arising from the pledge of warehouse receipts issued by the State of South Carolina on goods in the warehouse leased to the State under the authority of Section 70(c) of the Bankruptcy Act. 11 U.S.C. § 110(c) (1964). Under this section, the trustee has all of the rights and powers of a hypothetical lien creditor under the law of the state of the Bankrupt's residence. National Discount Corp. v. Tyson, 247 F. 2d 18 (4th Cir. 1957). The trustee seeks to assert this power to defeat the claim of a security interest to the goods for the benefit of general creditors. Therefore, the crucial question is whether the rights of such a lien creditor are superior to claimant's interest in the warehouse receipts under the law of South Carolina.

Based on the policy opposition to secret liens, recording acts provide the means of giving public notice to creditors that collateral in the possession of a debtor are encumbered by a security interest. Failure to record under the South Carolina statutes applicable to this transaction would invalidate a non-possessory security interest as against lien creditors. South Carolina Code of Laws, 1962, §§ 60–101, 57–308. Claimant argues that copies of the warehouse receipts were on file with the Department of Agriculture where they could be inspected by creditors. This, of course, does not satisfy the South Carolina recording act nor the policy opposition to secret liens since creditors would not be on notice to make such an inquiry.

An alternative method of perfecting a security interest against the competing claims of lien creditors is the pledge device whereby possession of the collateral is passed to the pledgee. In this situation, other creditors are not misled by the appearance of unfettered ownership of collateral not in actual possession of the debtor, and therefore, the requirement of public notice under the recording statute is dispensed with. Hinson v. Plowden, 91 F.Supp. 836 (W.D.S.C. 1950), Peurifoy v. Loyal, 154 S.C. 267, 151 S.E. 579 (1930). The pledge is expressly excluded from the recording requirements of the South Carolina Bailment Statute. South Carolina Code of Laws, 1962, § 57–308, Tucker v. Hudgens, 132 S.C. 374, 129 S.E. 77 (1925).

Since there was no recording of claimant's security interest, its validity against the trustee can only be sustained under the pledge theory. A pledge, valid against attack by creditors, may be established by constructive possession in the pledgee where goods are in possession of a third party bailee. This occurs when goods are stored in a warehouse and warehouse receipts representing the goods are delivered to the pledgee.

From this factual pattern and the theory of constructive possession of the goods in the holder of warehouse receipts there developed a financing device known as "field warehousing". Where it becomes impractical to deliver goods to a warehouse, the warehouse comes to the debtor in the sense that the debtor's premises are leased to a warehouseman in which goods are stored and warehouse receipts covering the goods are issued and delivered to a financer by way of pledge. See Skelton, Field Warehousing as a Financing Device, 1961, Wis.L.Rev. 221. An early case in the line of decisions upholding the validity of field warehousing against attack by a trustee in Bankruptcy was Union Trust Co. v. Wilson, 198 U.S. 530, 25 S.Ct. 766, 49 L.Ed. 1154 (1905). There a portion of the debtor's premises was leased to a warehouseman, walled off and fitted with doors to which the warehouse company held the only keys. Signs were posted stating that the premises were occupied by a public

warehouseman. After upholding the security interest of the holder of warehouse receipts issued by the warehouseman against the attack of the trustee in Bankruptcy, Justice Holmes, in speaking for the majority, added a word of caution: "We deal with the case before us only. No doubt there are other cases in which the exclusive power of the so-called bailee gradually tapers away until we reach those in which the courts have held as a matter of law that there was no adequate bailment." Two years later, the same Court held that the exclusive possession over the goods in the warehouseman had so tapered down and the warehousing arrangement became "a mere subterfuge to enable the bankrupt to hypothecate the receipts, and thus raise money upon secret liens on property in the possession of the pledgor and under its control." Security Warehousing Co. v. Hand, 206 U.S. 415, 426, 27 S.Ct. 720, 724, 51 L.Ed. 1117, 1124 (1907).

These two cases set the stage for subsequent litigation dealing with the validity of field warehousing arrangement turning principally on whether the warehouseman has visible evidence of possession. In Re United Wholesalers, Inc., 274 F.2d 316 (7th Cir. 1960). See 133 A.L.R. 211 (1941) for a collection of the earlier cases.

Some of the later cases have not made a fetish of the requirement of exclusive possession in the field warehouseman. For example, in Ribaudo v. Citizens National Bank of Orlando, 261 F.2d 929 (5th Cir. 1958), the court refused to invalidate the pledged warehouse receipts held by a bank on the ground that employees of the Bankrupt had to pass through the premises where the goods were stored and where a few tools belonging to the Bankrupt were located. The Court said that these defects in exclusive possession were trivial in light of the fact that Bankrupt had leased its warehouse premises to the field warehouseman, locks on all access doors and gates were changed and the keys in the sole possession of the warehouseman, signs posted in large print showed possession in the warehouseman and a bonded custodian, hired and paid by the warehouseman, took detailed inventories and had exclusive control over the goods and their release. In Bostain v. Park National Bank of Kansas City, 226 F.2d 753 (8th Cir. 1955), a similar field warehousing arrangement was established on the Bankrupt's premises and warehouse receipts covering the goods were pledged to a bank as security for a loan. The only defect in the arrangement was that, unknown to the warehouseman, its custodian had allowed the Bankrupt to have possession of the keys to the warehouse area. The court rejected the trustee's argument that this lack of exclusive possession in the warehouseman invalidated the pledge, the Court noting that from all outward appearances to interested third parties, the goods were not in possession of the Bankrupt.

While *Ribaudo* and *Bostian* may reflect a modern approach of some relaxation in the strict standard of clear, exclusive, notorious and continuous possession in the field warehouseman, the basic issue remains the same: Was there the appearance of exclusive possession and actual substantial control and possession in the warehouseman? In a recent case from the Fifth Circuit, warehouse receipts issued under a field warehousing arrangement and pledged to banks were held invalid in a bankruptcy proceeding under this standard. There the Bankrupt had leased part of its canning plants to a designated warehouseman who signed the receipts issued against the goods, but the Bankrupt retained possession of the warehouse space and moved goods in and out at will. Furthermore, there was no segregation of the goods and no designation or marks to identify any particular goods with any specific receipt. Whitney National Bank of New Orleans v. Sandoz, 362 F.2d 605 (5th Cir. 1966).

Viewing the facts of the instant case most favorable to the claimant, the only elements of possession of the goods under the warehouse receipts in a bailee were the posted "No Smoking" signs over the name of the South Carolina Department of Agriculture, the existence of a lease of the warehouse premises to the Department and the formal appointment of the warehouse manager with the responsibility of signing the receipts issued against the goods. Beyond that, there was neither real nor apparent, actual nor constructive possession in the issuer of the receipts. In fact, possession and control of the goods were exclusively in the Bankrupt except for the occasional inventory by agents of the Department of Agriculture. There were no markings on the goods indicating that they were under warehouse receipts and no description on the warehouse receipts identifying specific goods by serial number or otherwise. Goods purported to be under receipts were co-mingled with other goods and freely sold without being released from the receipts. Thus we have the case where the exclusive power of the so-called bailee tapers down to nothingness.

So far as appeared to other creditors of the Bankrupt, the real test of the validity of the security interest, goods in the warehouse represented unencumbered assets. As was said in Whitney National Bank of New Orleans v. Sandoz, supra, a case strikingly similar on its facts, the transaction was a "sham" and the documents "were warehouse receipts only in form."

Claimant argues that the warehouse receipts carry the absolute title to the goods described and in fact these receipts contained such a statement on their face. This is a correct statement of the law in the context of a valid negotiable warehouse receipt serving as a pledge of the goods by negotiation of the receipt to a pledgee. South Carolina Code of Laws, 1962, §§ 69–227, 69–228. See Flint Frozen Foods v. Firemen's Insurance Co. of Newark, 12 N.J.Super. 396, 78 A.2d 739 (1952). In this case where there was no possession in the bailee, this only serves to establish the good faith belief by the banks that they had a valid pledge interest. As the Court said in Whitney National Bank of New Orleans v. Sandoz: "The transactions were sham, and the good faith of the lenders could not inject validity into the documents which were warehouse receipts only in form." 362 F.2d 605, 607 (5th Cir. 1966).

Finally, claimant's position is in no way improved by the fact that an agency of the State of South Carolina attempted to act as the bailee-warehouse contrary to the usual pattern of a professional private field warehouseman. It is true that the South Carolina Department of Agriculture is authorized by statute to lease warehouse property and issue warehouse receipts on goods stored therein. S.C. Code of Laws, 1962, §§ 69–102, 69–110, 4–9. The South Carolina Uniform Warehouse Receipts Act, S.C. Code, 1962, § 69–151 et seq. limiting the authority to issue warehouse receipts to "a person lawfully engaged in the business of storing goods for profit", is expressly made "cumulative to the laws governing the operation of the State warehouse system" S.C. Code of Laws, 1962, § 69–156. While it is clear that the State has authority to engage in this type of warehousing and the issuance of receipts, it is equally clear that the legal requirements necessary to the validity of the receipts apply with equal force to the present case where the State acts as the warehouseman.

In light of this conclusion it is not necessary to consider the additional grounds of attack asserted by the Trustee relating to the defects in the form of the receipts.

## RECOMMENDATION

Having found that the warehouse receipts held by the claimant do not constitute a valid security interest against the Trustee in Bankruptcy, I, therefore recommend that this court approve the above findings and conclusions and pass its order disallowing the secured claim

without prejudice to the claimant for approval and allowance of its claim as a general creditor.

> Respectfully submitted,
> /s/ Robert W. Foster
> Robert W. Foster
> SPECIAL MASTER
> IN BANKRUPTCY

Columbia, South Carolina,
April 9, 1968.